AO 91 (Rev. 11/11) Criminal Complaint                                    Trial Attorney Kelly M. Warner, (202) 603-3180

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **FILED** |
| v. | **CASE NUMBER: 1:25-cr-00318** |
| MINHAJ FEROZ MUHAMMAD and SUFYAN FEROZE | **UNDER SEAL** |

6/13/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Count One

On or about May 3, 2023, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant MINHAJ FEROZ MUHAMMAD violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 | did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of a health care benefit program, as defined in Title 18, United States Code, Section 24(b), in connection with the delivery of and payment for health care benefits, items, and services, by causing to be submitted to BCBS-IL a claim for the purported provision of COVID-19 laboratory testing services to J.A., when such services were not provided. |

Count Two

On or about December 27, 2023, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant SUFYAN FEROZE violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1957 | did knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000, namely, a withdrawal of funds in the amount of $20,000 from the account ending in x9193 at Financial Institution A, such property having been derived from a specified unlawful activity, namely, health care fraud, in violation of Title 18, United States Code, Section 1347. |

This criminal complaint is based upon these facts:
  X Continued on the attached sheet.

AARON TAYLOR
Special Agent, Federal Bureau of Investigation

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: June 13, 2025

_Judge's signature_

City and state: Chicago, Illinois

GABRIEL A. FUENTES, U.S. Magistrate Judge
_Printed name and title_

UNITED STATES DISTRICT COURT    )
                                        )

NORTHERN DISTRICT OF ILLINOIS     )

## AFFIDAVIT

I, Aaron Taylor, being duly sworn, state as follows:

1.    I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately May 2022. I have received specialized training and participated in numerous health care fraud investigations. I have participated in the execution of multiple search warrants and arrests. I am a graduate of the FBI Academy's Special Agent Basic Field Training Course. I formerly served as a state prosecutor in Arizona, and I remain a member of the Arizona Bar.

2.    This affidavit is submitted in support of a criminal complaint alleging that (a) MINHAJ FEROZ MUHAMMAD ("MUHAMMAD") has committed the offense of health care fraud, in violation of Title 18, United States Code, Section 1347, and (b) SUFYAN FEROZE ("FEROZE") has committed the offense of money laundering, in violation of Title 18, United States Code, Section 1957. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging MUHAMMAD with health care fraud and FEROZE with money laundering, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I

believe are sufficient to establish probable cause to believe that the defendants committed the offenses alleged in the complaint.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents, and information I have received from various individuals, business records, and searches of public and governmental databases.

## I.     BACKGROUND

### A.     Background on Medicare

4.     Medicare is a federal health benefit program administered by the Center for Medicare and Medicaid Services ("CMS"), an agency of the U.S. Department of Health and Human Services. Medicare is funded through individual payroll taxes, other taxes, and user fees. Medicare helps pay for the reasonable and necessary medical services for people aged 65 and older and some persons under 65 with certain illness and/or disabilities. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

5.     Each Medicare beneficiary is identified with a unique beneficiary identifier number ("BIN"). BINs are used, among other ways, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services. Since 2015, CMS has assigned Medicare beneficiaries a randomly generated number called a

Medicare Beneficiary Identifier ("MBI"). These BINs are considered means of identification pursuant to 18 U.S.C. § 1028(d)(7).

6.      Medicare, as well as private health insurers, are "health care benefit programs" as defined by Title 18, United States Code, § 24(b), that is, a "public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual..." 18 U.S.C. § 24(b).

7.      Medical providers and suppliers must obtain a National Provider Identifier ("NPI") before enrolling in Medicare. Health care providers seeking to become a Medicare provider must submit enrollment documentation to Medicare, which includes, among other things, contact information for the provider.

8.      Every claim submitted by, or on behalf of, a physician or health care provider, includes an agreement by the provider to abide by Medicare's rules and regulations. As a condition of payment, Medicare requires providers to certify all information on the claim is true, correct, and complete. Additionally, the provider certifies the service was rendered personally by the provider or under his/her direct supervision and incident to the provider's care, and that the service was medically necessary for the health and/or well-being of the patient. Health care providers are paid by Medicare through the submission of claims. Medicare providers, with limited exception, are required to submit claims electronically. Those claims are submitted to Medicare and processed through a Medicare Administrative Contractor ("MAC"). Medicare reimburses claims electronically, and payments for

3

Medicare Part B services in Illinois are issued from National Government Services ("NGS"), a MAC headquartered in Indianapolis, Indiana. Therefore, claims for reimbursement submitted by a provider located in Illinois to Medicare are transmitted in interstate commerce. Payments are made into a provider's bank account through an electronic funds transfer, except in limited circumstances. Providers are also required to maintain all documents that substantiate Medicare claims for at least seven years.

9.     During the relevant time-period, Medicare beneficiaries could obtain polymerase chain reaction tests ("PCR tests"), which detected the COVID-19 virus. PCR tests required the collection of a mucus or saliva sample from the beneficiary, and test processing by a medical laboratory that was certified through the Clinical Laboratory Improvement Amendments ("CLIA") Program. Laboratories could bill these laboratory testing services to Medicare as well as related codes for ancillary services (e.g., collection), including 0240U,[1] U0003,[2] G2023,[3] and U0005,[4] provided

---

[1] AMERICAN MEDICAL ASSOCIATION, CPT PROFESSIONAL 2023 708 (2022) ("Infectious disease (viral respiratory tract infection), pathogen-specific RNA, 3 targets (severe acute respiratory syndrome coronavirus 2 [SARS-CoV-2], influenza A, influenza B), upper respiratory specimen, each pathogen reported as detected or not detected").

[2] AMERICAN ACADEMY OF PROFESSIONAL CODERS, 2023 HCPCS LEVEL II EXPERT (2022) (ebook) ("Infectious agent detection by nucleic acid (DNA or RNA); severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (coronavirus disease [COVID-19]), amplified probe technique, making use of high throughput technologies as described by CMS-2020-01-R.").

[3] AMERICAN ACADEMY OF PROFESSIONAL CODERS, 2023 HCPCS LEVEL II EXPERT (2022) (ebook) ("Specimen collection for severe acute respiratory syndrome coronavirus 2 (SARS-COV-2) (coronavirus disease [COVID-19]), any specimen source").

[4] AMERICAN ACADEMY OF PROFESSIONAL CODERS, 2023 HCPCS LEVEL II EXPERT (2022) (ebook) ("Infectious agent detection by nucleic acid (DNA or RNA); severe acute respiratory

4

that certain conditions were met, including that the services had actually been provided to the beneficiary.

## B.    Background Information on Blue Cross Blue Shield of Illinois

10.    Based on my training and experience and information provided by Blue Cross Blue Shield of Illinois ("BCBS-IL"), that entity is a "health care benefit program" under 18 U.S.C. § 24(b). Also based on my training and experience, and information provided by BCBS-IL, as a general rule, health care benefit plans, including BCBS-IL, will reimburse providers only for goods and/or services that were (a) actually performed; (b) medically necessary; and (c) covered by the health care benefit plan. In addition, by becoming a participating provider in a health care benefit plan, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing reimbursement, and to keep and allow the health benefit plans access to records and information required by the health benefit plan and federal and state regulators.

11.    Providers of services to BCBS-IL subscribers that seek reimbursement under the program are also required to submit certain information electronically or manually to BCBS-IL for each claim. Required claim information includes: the subscriber's name; his/her insurance number; the date of the service;

---

syndrome coronavirus 2 (SARS-CoV-2) (coronavirus disease [COVID-19]), amplified probe technique, CDC or non-CDC, making use of high throughput technologies, completed within 2 calendar days from date of specimen collection (list separately in addition to either HCPCS code U0003 or U0004 as described by CMS-2020-01-r2").

the location where the service was performed; a Current Procedural Terminology code identifying the service performed; charge for each service provided; and the provider's assigned provider number or tax identification number.

12.     According to BCBS-IL, once a claim is submitted to a health care benefit program, such as BCBS-IL, the specific dollar amount (if any) that the health care benefit program will pay on that claim depends on certain criteria, including the following: subscriber eligibility; whether the service was covered by the program; and the amount of the coverage offered by the program for that particular service.

13.     During the relevant time-period, BCBS-IL also paid for the processing of COVID-19 laboratory testing services, including 0240U, U0003, G2023, and U0005, provided that certain conditions were met, including that the services had actually been provided to the subscriber.

**C.     Background Information on FZ MEDICAL GROUP INC.**

14.     According to Illinois Secretary of State records, FZ MEDICAL GROUP INC. ("FZ MEDICAL") was incorporated in the State of Illinois on November 4, 2021.

15.     According to the Medicare Provider Enrollment, Chain, and Ownership System ("PECOS") records, FZ MEDICAL GROUP was registered as an independent clinical laboratory located at 1645 South River Road, Suite 24, Des Plaines, Illinois 60018, and became operational on or about December 31, 2022.

6

16.    According to Illinois Secretary of State records, Individual A became the registered agent of FZ MEDICAL on March 29, 2023. According to an email sent to Gmail Account A (associated with Individual A), further discussed below, in early April 2023, Individual A received an agreement for the purchase of FZ MEDICAL already executed by the then-current owner. According to PECOS records, between March 2023 and August 2023, Individual A's home address was identified as being within the City of Chicago in the State of Illinois.

17.    Medicare records indicate that FZ MEDICAL was an authorized Medicare provider with a valid National Provider Identification Number ("NPI") and valid Tax Identification Number ("TIN") on file with Medicare. Medicare provider enrollment documentation indicates that FZ MEDICAL became an approved Medicare provider on or about May 19, 2023. As of on or about May 31, 2023, FZ MEDICAL's Medicare provider enrollment documentation listed Individual A as the owner and authorized signer for FZ MEDICAL, effective May 1, 2023.

18.    According to PECOS, FZ MEDICAL obtained CLIA certification on or about May 19, 2023.

19.    On or about April 27, 2023, FZ MEDICAL submitted an application to BCBS-IL to provide health care products and services to its subscribers. The application was signed by an individual associated with Billing Company A, which submitted claims to insurers on behalf of FZ MEDICAL.

20.     On or about May 4, 2023, FZ MEDICAL entered into a business associate agreement with a health care claims clearinghouse, CLAIM.MD, using the UserID "fzlabs." According to records provided by CLAIM.MD, "fzlabs" accessed the CLAIM.MD system on May 5, 2023, and on May 8, 2023, using a device connected to the internet protocol ("IP") address[5] for which, according to records provided by Internet Service Provider A, MUHAMMAD is the subscriber and which is registered to MUHAMMAD's home address (the "MUHAMMAD IP Address").

21.     On or about May 5, 2023, Gmail Account A (associated with Individual A) was created, with an accompanying account name of Individual A's first and last name. Between July 10, 2023, and January 4, 2024, devices connected to the MUHAMMAD IP Address accessed Gmail Account A on approximately seven occasions.

22.     On or about May 9, 2023, FZ MEDICAL executed a business associate agreement with Office Ally, a second health care claims clearinghouse. While the agreement with Office Ally was signed in the name of Individual A on behalf of FZ MEDICAL, the signature was submitted by a device connected to the MUHAMMAD IP Address.

---

[5] An IP address is a unique numerical sequence assigned to a device connected to the Internet. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access particular accounts online.

23.    On or about May 24, 2023, a bank account ending in x9193 ("Account x9193") was opened at Financial Institution A in the name "FZ MEDICAL GROUP INC., DBA NEXT LABS INC." Individual A was identified on the account opening documents as the President of FZ MEDICAL. The day after Account x9193 was opened, FEROZE was added to the account as a signer. Going forward, FEROZE and Individual A were the signatories on the x9193 Account at all relevant times. Between May 25, 2023, and December 13, 2023, devices connected to the MUHAMMAD IP Address accessed Account x9193 through Financial Institution A's website on 39 occasions.

24.    According to email records obtained from Google pursuant to a search warrant for Gmail Account A, on the day the x9193 Account was opened, Gmail Account A sent two emails to sufyan.feroz@gmail.com. Per Google records, FEROZE (the co-signatory on Account x9193) is the subscriber of the account sufyan.feroz@gmail.com ("the FEROZE Gmail Account"). On that same day, Gmail Account A received an email from muhammad.mnhj@gmail.com. Per Google records, MUHAMMAD is the subscriber of the account muhammad.mnhj@gmail.com ("the MUHAMMAD Gmail Account).

25.    According to statements made by FEROZE and MUHAMMAD to a United States Customs and Border Protection agent on January 13, 2024, FEROZE and MUHAMMAD are brothers.

9

## II.   FACTS SUPPORTING PROBABLE CAUSE

26.   In summary, and as described more fully below, the investigation has shown that FZ MEDICAL has submitted tens of thousands of claims to Medicare and BCBS-IL seeking reimbursement for COVID-19 laboratory testing services that were not performed, as part of a scheme to defraud Medicare and BCBS-IL, for which the lab received millions of dollars into Account x9193, which then rapidly transferred the fraud proceeds to other accounts, including overseas. As discussed in more detail below, based on electronic communications obtained through a search warrant, financial and other business records obtained through subpoenas, and interviews with individuals with relevant knowledge, (a) there is probable cause to believe that, from at least April 1, 2023 to April 30, 2024, MUHAMMAD participated in the scheme by, among other things, causing the submission of claims for COVID-19 laboratory testing services that did not occur to Medicare and BCBS-IL, including a claim submitted to BCBS-IL on or about May 3, 2023, for COVID-19 testing purportedly provided to beneficiary J.A., when such services were not provided, and (b) FEROZE engaged in a monetary transaction of a value greater than $10,000 which was derived from specified unlawful activity – specifically, the FZ MEDICAL health care fraud scheme – including a withdrawal of $20,000 on December 27, 2023.

10

## A. The Health Care Fraud Scheme

### 1. MUHAMMAD's Transmission of Insureds' Information

27. According to emails obtained pursuant to a search warrant of Gmail Account A, in early May 2023, MUHAMMAD, using the MUHAMMAD Gmail Account, sent several emails to Individual A at Gmail Account A to which spreadsheets containing lists of information associated with Medicare beneficiaries and BCBS-IL subscribers, including BINs and BCBS-IL policy numbers, were attached. Based on my review of the spreadsheets, they contained a number features that, based on my training experience, are red flags that indicate that the subscriber information was not obtained pursuant to a legitimate medical relationship, including: (i) using FZ MEDICAL's address as the patient address for thousands of insureds, (ii) identifying just a handful of doctors as the referring provider for tens of thousands of claims, (iii) and referencing several other labs that are also under investigation for suspicious billing. According to Gmail Account A records, MUHAMMAD, using the MUHAMMAD Gmail Account, also sent at least one of these spreadsheets to FEROZE, at the FEROZE Gmail Account, on May 3, 2023.

28. Based on my review of Gmail Account A records, generally, Individual A, using Gmail Account A, then forwarded the spreadsheets to Billing Company A, which then submitted claims to insurers on behalf of FZ MEDICAL.

29. According to Medicare and BCBS-IL records, they paid FZ MEDICAL for claims for COVID-19 laboratory testing services purportedly provided to

11

insureds that were identified in spreadsheets provided by MUHAMMAD to Individual A.

30.  On May 2, 2023, MUHAMMAD, using the MUHAMMAD Gmail Account, sent a spreadsheet which contained information for tens of thousands of insureds to Gmail Account A. The spreadsheet included BCBS-IL subscriber J.A., including his/her date of birth, a purported patient address, and BCBS-IL subscriber identification number. The spreadsheet did not identify any services purportedly provided to J.A. or a date of service.

31.  On May 2, 2023, approximately two hours after receiving the spreadsheet from MUHAMMAD, Gmail Account A forwarded the spreadsheet containing J.A.'s information to Billing Company A.

32.  According to BCBS-IL records, on May 3, 2023, through Billing Company A, FZ MEDICAL requested reimbursement from BCBS-IL for various services, including COVID-19 testing, purportedly provided to J.A. on April 7, 2023. FZ MEDICAL billed BCBS-IL $200, and BCBS-IL paid FZ MEDICAL $75 for this claim.

33.  MUHAMMAD, using the MUHAMMAD Gmail Account, again sent at least one of these spreadsheets containing lists of information associated with Medicare beneficiaries and BCBS-IL subscribers, including BINs and BCBS-IL policy numbers, to Individual A at Gmail Account A in April 2024.

## 2. Beneficiary Complaints and Interviews

34. According to a report provided by BCBS-IL, on or about June 28, 2023, a BCBS-IL investigator interviewed J.A. regarding claims submitted by FZ MEDICAL for COVID-19 testing-related services. J.A., who had previously complained to BCBS-IL regarding this claim, stated he/she never received COVID-19 services from FZ MEDICAL.

35. Between April 27, 2023, and August 4, 2023, BCBS-IL received approximately 134 subscriber complaints alleging billing by FZ MEDICAL for COVID-19 laboratory testing services not rendered. In addition to J.A., BCBS-IL investigators interviewed seven subscribers, each of whom denied receiving services from FZ MEDICAL.

36. Medicare received similar complaints related to billing for services not rendered by FZ MEDICAL. Between October 19, 2023, and January 25, 2024, Medicare received approximately 254 complaints from beneficiaries reporting their Medicare accounts were billed for services purportedly provided by FZ MEDICAL, but that they did not know and/or did not receive services from FZ MEDICAL. Law enforcement interviewed seven Medicare beneficiaries for which FZ MEDICAL had submitted claims for purported COVID-19 laboratory testing services. Each of these Medicare beneficiaries denied receiving services from FZ MEDICAL.

37. According to records received from Google, on or about September 6, 2023, FZ MEDICAL responded to correspondence it had received from a private

attorney retained by BCBS-IL subscriber P.A. complaining about a claim submitted for COVID-19 laboratory testing services purportedly provided to P.A. On or about September 3, 2023, according to the metadata file properties for the document, user "Minhaj Muhammad" drafted a response to the letter sent to FZ MEDICAL by counsel for P.A. The response was drafted on FZ MEDICAL letterhead bearing an FZ MEDICAL watermark and laboratory contact information.

38.     Based on my training and experience, multiple insureds reporting the submission of claims for services not received may indicate that the provider is engaged in fraudulent billing for services that are not actually provided.

### 3.     Medicare Claims Analysis

39.     According to the Medicare claims data referenced above, FZ MEDICAL billed Medicare approximately $54,182,944.00, was initially authorized to be paid approximately $15,090,345.58, and actually received approximately $7,503,961.27 between April 1, 2023, and April 30, 2024. In that period, FZ MEDICAL submitted approximately 311,002 claims for COVID-19 laboratory testing services purportedly provided to approximately 73,886 Medicare beneficiaries who were located across the country.

40.     FZ MEDICAL billed for COVID-19 laboratory testing services, including 0240U, U0003, G2023, and U0005, at an exponential rate for a short

period of time. Based on my training and experience, rapid spikes in billing is uncommon among legitimate providers and can be indicative of fraud.

41.     The chart below illustrates the totality of FZ MEDICAL's Medicare claim submittals, from on or about July 1, 2023 through April 30, 2024:

| Month | Number of Beneficiaries | Number of Medicare Claims | Approx. Billed Amount to Medicare | Approx. Paid Amount by Medicare |
|---|---|---|---|---|
| July 2023 | 0 | 0 | $0.00 | $0.00 |
| August 2023 | 2,173 | 6,678 | $937,844.00 | $0.00[6] |
| September 2023 | 0 | 0 | $0.00 | $0.00 |
| October 2023 | 37,418 | 161,776 | $28,298,900.00 | $7,503,961.27 |
| November 2023 | 35,066 | 142,532 | $24,943,400.00 | $0.00[7] |
| December 2023 | 1 | 4 | $700.00 | $0.00 |
| January 2024 | 1 | 4 | $700.00 | $0.00 |
| February 2024 | 0 | 0 | $0.00 | $0.00 |
| March 2024 | 1 | 4 | $700.00 | $0.00 |
| April 2024 | 1 | 4 | $700.00 | $0.00 |

---

[6] Per CMS, each claim submitted in August 2023 was rejected for one of the following reasons: "MISSING INFORMATION NEEDED TO ADJUDICATE THE CLAIM," "CLAIM LACKS INFORMATION NEEDED TO ADJUDICATED," or "LAB NOT APPROVED TO PERFORM SERV UNDER CLIA."

[7] Medicare initially approved $7,587,688.16 for payment in the month of November 2023, but escrowed the funds due to its identification of the billing trends as suspicious. These funds were not ultimately paid out to FZ MEDICAL.

42.    Additional data analysis shows a high volume of billing to Medicare on specific dates. In particular, between October 5, 2023, and October 17, 2023, FZ MEDICAL billed Medicare approximately $28,265,100.00 for purported COVID-19 laboratory testing services. From November 15, 2023, to November 16, 2023, FZ MEDICAL billed Medicare approximately $13,322,600.00 for purported COVID-19 laboratory testing services. On November 27, 2023, FZ MEDICAL billed Medicare approximately $11,318,500.00 for purported COVID-19 laboratory testing services. This single day of billing—November 27, 2023—accounted for over 20% of FZ MEDICAL's total Medicare billing.

43.    In total, approximately 97% of FZ MEDICAL's claim submittals to Medicare between April 1, 2023, and April 30, 2024, occurred on twelve days in October and November 2023. Based on my training and experience, voluminous billing over the course of a limited number of days is uncommon among legitimate providers and can be indicative of fraud.

### 4.    Blue Cross Blue Shield of Illinois Claims Analysis

44.    According to BCBS-IL claims data provided on or about November 28, 2023, between April 13, 2023, and October 27, 2023, FZ MEDICAL caused the submission of billing to BCBS-IL for approximately $18,343,767.50 for COVID-19 laboratory testing services, was initially authorized to be paid approximately $3,663,462.74, and ultimately received $2,279,542.06. In that period, FZ MEDICAL submitted approximately 118,670 claims for COVID-19 laboratory

16

testing services purportedly provided to approximately 20,929 BCBS-IL subscribers.

45.     FZ MEDICAL billed for COVID-19 laboratory testing services, primarily U0003, U0005, and G2023, at an exponential rate for a short period of time. Based on my training and experience, rapid spikes in billing is uncommon among legitimate providers and can be indicative of fraud.

46.     The chart below illustrates the totality of FZ MEDICAL's BCBS-IL claim submittals between March 1, 2023, and November 30, 2023:

| Month in 2023 | Number of Beneficiaries | Number of BCBS-IL Claims | Approx. Billed Amount to BCBS-IL | Approx. Paid Amount Initially Approved for Payment by BCBS-IL[8] |
|---|---|---|---|---|
| March | 0 | 0 | $0.00 | $0.00 |
| April | 3 | 5 | $640.00 | $123.46 |
| May | 19,696 | 78,269 | $10,432,292.50 | $3,345,187.37 |
| June | 3,588 | 12,311 | $3,150,770.00 | $165,230.89 |
| July | 6,603 | 26,892 | $4,573,647.00 | $124,559.37 |
| August | 232 | 847 | $130,210.00 | $24,917.34 |
| September | 20 | 64 | $8,708.00 | $1,542.38 |

---

[8] Not all of these BCBS-IL approved funds were ultimately paid out to FZ MEDICAL.

17

| Month in 2023 | Number of Beneficiaries | Number of BCBS-IL Claims | Approx. Billed Amount to BCBS-IL | Approx. Paid Amount Initially Approved for Payment by BCBS-IL[8] |
|---|---|---|---|---|
| October | 71 | 282 | $47,500 | $1,901.93 |
| November | 0 | 0 | $0.00 | $0.00 |

47.     Additional data analysis of FZ MEDICAL's billing to BCBS-IL shows a high volume of billing to BCBS-IL on specific dates. In particular, over a ten-day period in May of 2023, FZ MEDICAL submitted claims to BCBS-IL of approximately $10,381,693.00 for purported COVID-19 laboratory testing services. Based on my training and experience, voluminous billing over the course of a limited number of days is uncommon among legitimate providers, and can be indicative of fraud.

**B.     Money Laundering**

**1.     Review of FZ MEDICAL Financial Records**

48.     Between May 24, 2023, and December 29, 2023, Financial Institution A received deposits of approximately $10,385,550.32 into Account x9193. Of that amount, approximately $7,503,961.27 were remittances from Medicare, and approximately $2,279,542.06 were remittances from BCBS-IL.

49.     Based on the evidence of the fraud scheme described above, including billing for services not rendered; unusual spikes in billing (at different times) first

18

to BCBS-IL, then to Medicare; and the subsequent movement of money obtained from BCBS-IL and Medicare, I believe the claims that resulted in these deposits were fraudulent and that the COVID-19 laboratory testing services for which FZ MEDICAL received payment had never actually been provided and constituted fraud proceeds.

50.     During the same time-period, FZ MEDICAL engaged in rapid money movement out of the account consistent with money laundering. FZ MEDICAL depleted approximately $10,019,837.13 from Account x9193 via transfers totaling approximately $7,553,356.01; checks totaling approximately $2,130,634.07; cash withdrawals totaling approximately $296,500.00; and debit card purchases totaling approximately $39,347.05.

51.     In the approximately fourteen days after receiving the approximately $7,503,961.27 payment from NGS in Account x9193 (during which Account x9193 only received a single other deposit – an approximately $123.46 payment from BCBS-IL), FZ MEDICAL used the proceeds of the payment to fund three outgoing wire transfers totaling approximately $6,025,000. Two of the wire transfers, one for approximately $2,000,000 on or about November 21, 2023, and the second for approximately $2,000,000 on or about November 30, 2023, were made to Real Estate Entity A, which, according to records received from Financial Institution B, is a United Arab Emirates real estate company offering luxury properties with which FEROZE contracted for the purchase of property located in the United Arab

19

Emirates. According to financial records obtained by law enforcement, the Real Estate Entity A account to which Account x9193 transferred funds is held with Financial Institution B, and was opened on or about May 31, 2023 – at the outset of the spike in billing by FZ MEDICAL, first to BCBS-IL and then to Medicare. According to Financial Institution A wire transfer records, Financial Institution B is located in Dubai, United Arab Emirates.

52.     In addition to the two transfers totaling approximately $4,000,000 to Real Estate Entity A, on or about November 30, 2024, the same day as FZ MEDICAL's second wire transfer to Real Estate Entity A, FZ MEDICAL also wired approximately $2,025,000.00 to Metal Dealer A. According to its website, Metal Dealer A is a precious metals dealer operating out of offices in Chicago.

53.     Beneficiaries of additional wire transfers occurring in December of 2023 include a second Emirati luxury property real estate developer and two overseas export businesses. According to records received from the U.S. Customs and Border Protection ("CBP"), in early January 2024, MUHAMMAD and FEROZE traveled to the United Arab Emirates.

54.     Of the approximately $296,500.00 in cash withdrawals made from Account x9193, at least $30,000.00 was withdrawn by FEROZE, according to the Financial Institution A teller journals associated with Account x9193. FEROZE withdrew the cash on June 9, 2023 and August 8, 2023. Additionally, on December 27, 2023, FEROZE withdrew $20,000 in cash and requested a cashier's check made

payable to FEROZE, which FEROZE then deposited in his personal bank account ending in x2352 at Financial Institution C.

55.     Of the approximately $134,528.77 in debit card purchases made from Account x9193, approximately $21,506.47 of the payments were made to two Emirati jewelers, an Emirati luxury and performance car rental service, Emirates Airlines, and a clothing retailer during a several week period when, according to records provided by CBP, FEROZE was physically present in the United Arab Emirates.

56.     Based on my training and experience, expenditures reflected in Account x9193 are inconsistent with what would be expected for a legitimate laboratory operation. Importantly, this business account for FZ MEDICAL did not pay any expenses to known suppliers of laboratory instruments, detection systems, specimen collection and storage equipment, sample disposal mechanisms, reagent, or other medical supplies necessary for COVID-19 laboratory testing. Based on my training and experience, the absence of common operating expenses in financial accounts may indicate that the business was operationally incapable of rendering services claimed and can be indicative of fraud.

## III.     CONCLUSION

57.     In summary, according to witnesses and records obtained by law enforcement, from on or about April 1, 2023, through on or about April 30, 2024, MUHAMMAD caused false and fraudulent claims to be submitted by FZ MEDICAL to Medicare and BCBS-IL for purported COVID-19 laboratory testing

services. The fraudulent claims include a claim submitted by FZ MEDICAL to BCBS-IL on May 3, 2023, for COVID-19 laboratory testing services purportedly provided to beneficiary J.A. on or about April 7, 2023, for which BCBS-IL paid FZ MEDICAL $75. Further, according to witnesses and records obtained by law enforcement, FEROZE withdrew funds in the amount of $20,000 from the account ending in x9193 at Financial Institution A, such property having been derived from a specified unlawful activity, namely, health care fraud, in violation of Title 18, United States Code, Section 1347.

58.    Based on the facts described above, I respectfully submit there is probable cause to believe that MINHAJ FEROZ MUHAMMAD committed health care fraud, in violation of Title 18, United States Code, Section 1347, and SUFYAN FEROZE committed money laundering, in violation of Title 18, United States Code, Section 1957.

FURTHER AFFIANT SAYETH NOT.

Aaron Taylor
Special Agent
Federal Bureau of Investigation

Sworn to and affirmed by telephone 13th day of June, 2025

Honorable GABRIEL A. FUENTES
United States Magistrate Judge

22